# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
November 18, 2010 Session[1]

## DEBORAH VIVIEN
### v.
## KEITH W. CAMPBELL

**Appeal from the Juvenile Court of Shelby County**
**No. J9332     Herbert J. Lane, Juvenile Court Special Judge**

---

**No. W2009-01602-COA-R3-JV - Filed May 10, 2011**

---

This appeal involves child support arising out of a paternity action. After paternity was established, the mother sought discovery regarding the father's income. After protracted discovery disputes, the juvenile court set child support based on income that included the father's winnings from gambling. The juvenile court did not permit the gambling winnings to be offset by the father's gambling losses. After the father requested a rehearing on child support, years of delay ensued, and his rehearing request was ultimately dismissed. The father now appeals. We affirm in part, reverse in part, and remand, holding *inter alia*, that in determining an obligor parent's income for child support purposes, provable gambling losses may offset gambling winnings, up to the amount of the gambling winnings for the year in question.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**is Affirmed in Part, Reversed in Part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

---

[1]After oral argument in this cause, upon the Court's detailed review of the record, the Court *sua sponte* raised the issue of the trial court's subject matter jurisdiction. The parties were asked to submit briefs on the issue, and the Court considered the appeal after the supplemental briefs were filed.

Valerie T. Corder, Memphis, Tennessee, for Petitioner/Appellee, Deborah Vivien.

Carroll C. Johnson III, Memphis, Tennessee, for Respondent/Appellant, Keith W. Campbell.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; and Warren Jasper, Senior Counsel, General Civil Division, Nashville, Tennessee for Appellee, State of Tennessee *ex rel.* Deborah Vivien.

**OPINION**

**FACTS AND PROCEEDINGS BELOW**

Petitioner/Appellee Deborah Vivien ("Mother") and Respondent/Appellant Keith Campbell ("Father") had a daughter born on October 11, 1997, in Memphis, Tennessee. The parties were never married to each other. The child lived with Mother. In 1998, Mother filed a petition in the Juvenile Court of Memphis and Shelby County, Tennessee to establish paternity, seeking custody, child support, and reimbursement of medical expenses. Not long after that, Mother sought discovery regarding, *inter alia*, Father's income. Thus began a long odyssey to ascertain and prove Father's income for child support purposes, the subject of this appeal.

Father's primary income came from D & L, Inc. ("D&L"), a Tennessee trucking corporation in which Father had a forty-nine percent ownership interest, with the remainder owned by his mother. Father was the president of D&L. Father also engaged in extensive gambling, although whether he derived income from his gambling activities remains the subject of dispute.

In July 1999, the Juvenile Court ordered DNA testing to determine if Father is the child's biological father. By that time, Mother and the child had moved from Tennessee to Hattiesburg, Mississippi. Mother sought to discover numerous personal financial records of Father, as well as extensive corporate records of D&L. Father was ordered to produce numerous documents, including his home mortgage application, K-1 statements for D&L, and bank or investment records. Not long after that, Father filed a motion to establish court-ordered visitation, asserting that Mother unilaterally terminated his visitation with the child.

The Juvenile Court Referee held a hearing in September 1999. Father's paternity was established at that hearing. Father's attorney asserted that Father's gross income was $10,394 per month. The hearing was marked by arguments over Father's income, including disputes over Father's company vehicle and expense account, Father's gambling winnings and losses, Father's personal financial records, and D&L's corporate records. The Juvenile Court granted

Mother's request for Mother's attorney to go to D&L offices to review the corporate records, and ordered Father to produce various financial records from his personal accounts and D&L's corporate accounts. Father was ordered to maintain medical insurance coverage on the child, and to pay Mother for the medical expenses incident to the birth of the child. Based on Father's claimed income of $10,934 per month, temporary child support was set at $1575 per month. Father was granted weekly parenting time.

Discovery skirmishes and contempt petitions ensued. Mother alleged that Father continuously refused to produce the requested documents, and that the documents received were incomplete.

The Juvenile Court Referee conducted a hearing over a two-day period, January 28, 2000 and February 8, 2000. The subject of the hearing was Father's child support obligation.

On January 28, 2000, Mother called as an expert witness Mr. David Curbo ("Mr. Curbo"), a certified public accountant. Mr. Curbo offered opinion testimony as to Father's income in 1998 and 1999 based on his analysis of financial records of both Father and D&L, furnished to him by Mother's counsel. Mr. Curbo described the records furnished to him as incomplete; his testimony consisted of analysis of existing documents and projections of account balances and income to fill in gaps in the documentation. Mr. Curbo was provided records concerning four different personal and business bank accounts of Father; the records included checks and some bank statements.[2] Subtracting substantial amounts in bounced checks[3] and utilizing incomplete records of deposits, Mr. Curbo projected that the deposits into Father's various accounts during the year 1999 totaled $728,630.80. He offered opinion testimony that this amount represented Father's gross annual income.

At the February 8, 2000 hearing, after continued skirmishing over whether Father had produced various financial documents, Father testified that his main sources of income were D&L, rental property, and a transportation brokerage partnership. Based on his 1998 income tax return, Father testified to 1998 wages in the amount of $117,014, and gross rental income in the amount of $18,000. The 1998 return showed approximately $2800 in gambling winnings, offset by gambling losses in the same amount.[4] Based on his 1999 W-2 from D&L,

---

[2]The record is unclear, but the bank records relied upon by Mr. Curbo appear to be 1999 records. Mr. Curbo had nine months' statements for one account, seven months' statements for another, five months' statements for a third, and for the fourth account, he had only one statement.

[3]The accountant testified that Father bounced $116,000 in checks during 1999.

[4]Father testified that gambling losses could be deducted on his income tax return only up to the amount of
(continued...)

-3-

Father testified to total 1999 income of $122,000, including his use of a company vehicle. In response to Mr. Curbo's testimony on the considerable deposits into his bank accounts, Father testified that some of the deposits coming into his accounts were loans, some were transfers from other accounts, and that much of the money simply went through his bank accounts for gambling purposes. Father maintained that he lost a considerable amount of money in 1999 from gambling. During this testimony, the Juvenile Court Referee commented that "child support guidelines don't say you deduct losses from winnings in gambling."

After the hearing, Father filed a pleading asking the Juvenile Court to permit him to present expert testimony from his accountant, arguing that his income for purposes of determining child support was $133,900 per year, and maintaining that his gambling winnings should be offset by his gambling losses. Father asserted that his child support obligation under the guidelines should be set at $1611 per month.

The parties returned to court on April 4, 2000. Father was not represented by counsel at this hearing, and his request for a continuance was denied. No proof was submitted at the hearing.

After the hearing, the Juvenile Court Referee entered an order with recommendations as to Father's obligations. The Referee found that Father had failed to follow previous court orders concerning, *inter alia*, providing financial documents. The Referee stated that Father's "attempt to use gambling losses to off-set income is not well-taken, and shall not be considered by the court." The Referee recommended setting child support at $12,979 per month, and determined that Father's child support arrearage totaled $250,143.40. The Juvenile Court Referee's recommendations were confirmed by the Juvenile Court Judge.[5] On April 7, 2000, Father requested a rehearing before the Juvenile Court Judge, pursuant to the Juvenile Court Rules.

The rehearing Father requested was held on June 18, 2000. After arguments about whether Father produced requested discovery, Father was permitted to testify. Based on his 1998 income tax return, Father testified that his 1998 salary was $107,014, and that his income from all sources totaled $128,561. On his 1998 income tax return, Father claimed gambling winnings of $2800, with a corresponding deduction in the same amount for his gambling

---

[4](...continued)
his gambling winnings, so that his income from gambling on his 1998 return was "zero[ed] . . . out" by his losses. *See* 34 AM. JUR. 2D *Federal Taxation* § 16836 Gambling Losses ("Gambling losses in the tax year are deductible . . . , but only to the extent of that year's gambling gains.").

[5]For reasons that do not appear in the record, the Juvenile Court Referee's recommendations were dated April 4, 2000, and in an apparent typographical error, the confirmation by the Juvenile Court Judge is dated February 8, 2000. This discrepancy is not raised on appeal and does not affect our analysis.

losses.  Based on his 1999 income tax return, Father claimed that his 1999 wages were $117,120.  The 1999 return showed $1,246,773 in gambling winnings, with an offsetting deduction for the same amount in gambling losses.[6]  Father's attorney protested that Mother was not cooperating with Father to provide him parenting time, but there was no proof on that issue.

After the hearing, the Juvenile Court Referee entered an order continuing the matter generally, and directing Mother to file a list of documents she was seeking from Father.  The order stated that, after Mother submitted her request and Father submitted his response, the Juvenile Court would set "a date certain for the hearing."  The May 25, 2000 order established a temporary parenting schedule.

Subsequently Mother filed a lengthy list of document requests.  Father submitted responses asserting that numerous documents had been produced.

In November 2000, Father filed a motion for a continuance indicating that he had filed for bankruptcy.  After that, general continuances of the matter were granted in 2002 and in 2003.

In August 2005, Mother filed a motion to dismiss Father's petition for a rehearing for lack of prosecution, on the grounds that Father failed to prosecute his request for rehearing for over five years.[7]  Father's response claimed that Mother was partially to blame for the inordinate delay because she left the jurisdiction for a period of time and could not be located.  Father's response asked the Juvenile Court to set the case for a hearing.

On September 14, 2005, a hearing was held, apparently on Mother's motion to dismiss Father's petition for rehearing for lack of prosecution.  The Attorney General's office was present at the hearing.[8]  The hearing was before a Juvenile Court Referee, sitting as Special Judge.  The attorneys for the parties each argued vigorously that the other party was most at fault for the lengthy delay in resolving the question of Father's child support.

---

[6]For both 1998 and 1999, Father testified that he had more in gambling losses than were deducted. Therefore, under Father's testimony, in 1999, he lost more than $1,246,773 gambling.  The Juvenile Court Referee commented, "I very seldom look at one million dollars in winnings and losses."

[7]The request for rehearing that is the subject of the motion to dismiss for lack of prosecution does not appear in the appellate record, and Mother's motion does not specify the date of the underlying order on which Father sought a rehearing.

[8]Mother was receiving Title IV-D services; therefore, the State of Tennessee was authorized to proceed on her behalf.  T.C.A. § 71-3-124(c) (2004); 42 U.S.C. § 654(4) (2010); 45 C.F.R. § 302.33 (2010).

At the conclusion of the hearing, the Juvenile Court Referee, sitting as Special Judge, entered an order denying Mother's motion to dismiss Father's petition for rehearing for lack of prosecution, and took under advisement Father's response to Mother's motion to dismiss for lack of prosecution and Father's motion to set the case for hearing. Mother's subsequent request for rehearing was denied, while Father's request to set the case for hearing before the judge remained pending.

In July 2009, Mother filed a second motion to dismiss Father's request for rehearing for lack of prosecution. That same day, the Juvenile Court Referee, sitting as Special Judge, issued an order dismissing Father's request for rehearing, confirming the original amount of child support set in the April 4, 2000 order, and granting Mother's motion to dismiss for lack of prosecution.[9] Father now appeals.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Father asserts that the Juvenile Court erred in dismissing his petition to rehear. He argues that the Juvenile Court did not properly calculate his child support obligation in that it failed to make a factual finding on his income. Father claims that the evidence offered by Mother's accountant expert was speculative and insufficient to support the Juvenile Court's ruling, and that the Juvenile Court was required to average his income over a two-year time period. Father also argues that the Juvenile Court erred in disregarding his gambling losses when determining his child support obligation, and in failing to deduct his income tax.

In response, Mother and the State of Tennessee argue that the Juvenile Court correctly dismissed Father's petition to rehear the determination of his child support obligation because he was either unwilling or unable to provide proper documentation and prosecute his case. Both assert that the Juvenile Court correctly determined Father's child support obligation in this case, based on the expert testimony of Mother's accountant. They argue that the Juvenile Court was not required to average Father's income over a two year time period, and was correct in disregarding Father's gambling losses in setting child support.

On appeal, "[w]hen the trial court has set forth its factual findings in the record, we will presume the correctness of these findings so long as the evidence does not preponderate against them." *Evans v. Evans*, No. M2002-02947-COA-R3-CV, 2004 WL 1882586 at *4 (Tenn. Ct. App. Aug. 23, 2004), *no perm. app.* (citing TENN. R. APP. P. 13(d); *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000)); *accord Nashville Ford Tractor, Inc. v. Great Am. Ins. Co.*, 194 S.W.3d 415, 424 (Tenn. Ct. App. 2005). In the absence of findings of fact,

---

[9]Mother's second motion to dismiss also sought attorney fees, which were not granted in the July 2009 order. The order was subsequently made final, dismissing Mother's request for attorney fees.

the appellate court must conduct its own independent review of the record to determine where the preponderance of the evidence lies. *Brooks v. Brooks* 992, S.W.2d 403, 405 (Tenn. 1999). The trial court's conclusions of law are reviewed *de novo* with no presumption of correctness. *Nashville Ford Tractor, Inc.*, 194 S.W.3d at 425.

## ANALYSIS

### Subject Matter Jurisdiction

At the outset, we address the trial court's subject matter jurisdiction. After oral argument in this appeal, upon the Court's review of the appellate record, it appeared that both Mother and Father had moved from Tennessee at the time the Juvenile Court entered the order from which Father appeals. In light of this, the Court asked the parties to submit supplemental briefs on the issue of the trial court's subject matter jurisdiction. The Court has considered the parties' supplemental briefs.

Subject matter jurisdiction implicates a court's power to hear a particular case or controversy. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004); *McQuade v. McQuade*, No. M2010-00069-COA-R3-CV, 2010 WL 494086, at *4 (Tenn. Ct. App. Nov. 30, 2010). In the absence of subject matter jurisdiction, a court cannot enter a valid, enforceable order. *Brown v. Brown*, 281 S.W.2d 492, 497 (Tenn. 1955); *McQuade*, 2010 WL 4940386, at *4. Therefore, subject matter jurisdiction may be raised at any time by the parties or by the appellate court, *sua sponte*, on appeal. *County of Shelby v. City of Memphis*, 365 S.W.2d 291, 411 (Tenn. 1963); *McQuade*, 2010 WL 4940386, at *4. Accordingly, when the question of subject matter jurisdiction arises, the court must first determine whether the Tennessee Constitution, the Tennessee General Assembly, or the common law have conferred on it the power to adjudicate the case before it. *Staats v. McKinnon*, 206 S.W.3d 532, 542 (Tenn. Ct. App. 2006); *McQuade*, 2010 WL 4940386, at *4.

In the case at bar, it is undisputed in the record that by March 1999, Mother and the parties' child had moved out of Tennessee, apparently first to Mississippi and then to Louisiana. The record also indicates that, at some point, Father moved out of Tennessee as well. His notice of appeal lists an address outside of Tennessee, and the transcripts of the proceedings below contain references to Father no longer living in Tennessee, primarily statements by Mother's attorney or by the State's attorney.[10]

---

[10]For example, during the September 14, 2005 hearing, Mother's attorney stated that Father "didn't live in the state." At the same hearing, the attorney for the State of Tennessee stated to the trial judge, "The State of Tennessee no longer has an interest in this, when he left the state years ago; she left the state before this

(continued...)

Under these circumstances, it is incumbent upon the Court to ascertain whether the trial court retained jurisdiction to rule on the child support questions at issue in this appeal. The Uniform Interstate Family Support Act ("UIFSA") governs interstate jurisdiction in child support matters.[11] *See* T.C.A. §§ 36-5-2101 *et seq*; *McQuade*, 2010 WL 4940386, at *10. The UIFSA defines "child support order" as "a support order for a child," and does not restrict the term to final appealable orders. T.C.A. § 36-5-2101(2) (2002). A "support order" is defined as "a judgment, decree, or order, whether temporary, final, or subject to modification, for the benefit of a child." T.C.A. § 36-5-2101(2) (2005).

The UIFSA defines "home state" as "the state in which a child lived with a parent . . . for at least six (6) consecutive months immediately preceding the time of filing of a petition or comparable pleading for support." The "issuing state" is the state in which a court issues a support order, and the "issuing tribunal" is the court that issues the support order. T.C.A. § 36-5-2101(9), (10) (2005).

The UIFSA sets forth the parameters for a Tennessee court's "continuing, exclusive jurisdiction" over a child support order. Section 36-5-2205 provides in pertinent part:

> (a) A tribunal of this state issuing a support order consistent with the law of this state had continuing, exclusive jurisdiction over a child-support order;
> > (1) As long as this state remains the residence of the obligor, the individual obligee, or the child for whose benefit the support order is issued; or
> > (2) Until all of the parties who are individuals have filed written consents with the tribunal of this state for a tribunal of another state to modify the order and assume continuing, exclusive jurisdiction.

T.C.A. § 36-5-2205(a)(1) and (2) (2005). The comments to this section of the UIFSA are instructive:

> This section is perhaps the most crucial provision in UIFSA. . . . [T]he issuing tribunal retains continuing, exclusive jurisdiction over a child support order, except in very narrow circumstances. As long as one of the individual parties

---

[10](...continued)
case was ever litigated."

[11]In 2010, the UIFSA was amended substantially. *See* 2010 Pub. Acts Ch. 901 (May 2010). However, the order being appealed was entered in 2009, so we apply the statutes in effect at that time.

or the child continues to reside in the issuing State, and as long as the parties do not agree to the contrary, the issuing tribunal has continuing, exclusive jurisdiction over its order – which in practical terms means that it may modify its order.

T.C.A. § 36-5-2205, cmt. (2005). Therefore, the comments state that the issuing tribunal retains exclusive jurisdiction to modify its order unless the narrowly defined exceptions apply. *McQuade*, 2010 WL 4940386, at *11. The official comments also draw the negative inference from the statutory language, to define when the issuing court loses its continuing, exclusive jurisdiction to modify its child support order:

The other side of the coin follows logically. Just as subsection (a)(1) defines the retention of continuing, exclusive jurisdiction, by clear implication the subsection also defines how jurisdiction to modify may be lost. That is, if all the relevant persons – the obligor, the individual obligee, and the child – have permanently left the issuing State, the issuing State no longer has an appropriate nexus with the parties or child to justify exercise or jurisdiction to modify. Further, the issuing tribunal has no current information about the factual circumstances of anyone involved, and the taxpayers of that state have no reason to expend public funds on the process.

T.C.A. § 36-5-2205, cmt. (2005). Thus, the comments state that if all of the relevant persons, that is, the parents and the child, have moved away from the issuing state, the issuing court loses jurisdiction to modify its child support order. *McQuade*, 2010 WL 4940386, at *11. The comments note, however, that the initial child support order of the issuing tribunal remains valid and enforceable. T.C.A. § 36-5-2205, cmt. (2005); *McQuade*, 2010 WL 4940386, at *11.

This Court has held that, if Tennessee is the "issuing state," once the parents and the minor child have left the issuing state, that state no longer has jurisdiction to modify its child support order. *McQuade*, 2010 WL 4940386, at *11-12. However, the last child support order entered at a time at which the Tennessee court had exclusive jurisdiction remains valid and enforceable. *Id.*

In the instant case, the parties argue in their supplemental briefs that the UIFSA is not applicable because this appeal does not involve a petition to modify child support. We must respectfully reject this argument. While it is true that Father did not file a petition to modify his child support obligation, his efforts to obtain a rehearing of the recommendation of the Juvenile Court Referee on his child support obligation, as confirmed by the Juvenile Court Judge, can only be seen as utilizing Juvenile Court procedures to obtain a reduction of his

child support from the $12,979 per month amount set in the Juvenile Court's April 2000 order.

As noted above, it is undisputed that Mother and the child moved away from Tennessee many years ago, and so Tennessee is no longer the child's home state under the UIFSA. Therefore, the pivotal issue revolves around the state in which Father was residing at the pertinent time. In the supplemental briefs, the parties argue that the appellate record does not indicate clearly that Father has moved away from Tennessee. Upon review, while the transcripts of the Juvenile Court proceedings include several references to the fact that Father was no longer living in Tennessee, the references are in the form of statements by attorneys not representing Father, *i.e.*, statements by Mother's attorney or the State's attorney. In a prior case in which the Court found that the trial court lost continuing jurisdiction to modify its earlier child support order, the references in the record came in the form of evidence such as affidavits or exhibits. *See McQuade*, 2010 WL 4940386, at *8. While Father's notice of appeal in this case lists an address outside Tennessee, this, of course, does not show his residence earlier in the proceedings, and we are not inclined to make a finding that he moved away from Tennessee based on statements of attorneys not representing Father at that time.

Under these circumstances, as urged by all of the parties in their supplemental briefs, we decline to find that the appellate record clearly shows that the trial court did not have subject matter jurisdiction to consider Father's petition to rehear and Mother's motion to dismiss for lack of prosecution. In his supplemental brief on subject matter jurisdiction, Father seeks to raise additional issues regarding the constitutionality of applicable statutes, and in response Mother seeks permission to brief these additional issues. However, our ruling on the trial court's subject matter jurisdiction pretermits any such issues.[12] Therefore, we go on to consider the substantive issues presented on appeal.

### Dismissal of Petition to Rehear

Father argues on appeal that the trial court erred in dismissing his petition to rehear the Juvenile Court Referee's recommendation, confirmed by the Juvenile Court Judge, that Father's child support obligation be set at $12,979 per month. He notes that the record shows that the delay in prosecuting Father's petition to rehear was caused in part by factors that relate to Mother, such as the fact that Mother, living in another state, could not be located for a significant length of time, and that some of the continuances were at the request of Mother's counsel. He also points out that Mother's motion to dismiss for lack of prosecution was not served on Father in advance of the hearing. Under all of these circumstances, Father argues that dismissal was an unduly harsh sanction.

---

[12]Therefore, Mother's motion for permission to file a second supplemental brief is denied.

In response, Mother argues that the appropriate standard of review for the Juvenile Court's decision is abuse of discretion, and that the Juvenile Court did not abuse its discretion in dismissing Father's petition to rehear. She emphasizes Father's consistent refusal to fully cooperate in producing documentation on his income, and his failure to bring the matter to resolution during the nine years after the Juvenile Court's April 2000 ruling on his child support obligation. Mother contends that the dismissal of the petition to rehear should be affirmed, and that affirming the dismissal of the petition to rehear pretermits the remaining substantive issues raised by Father. The State makes similar arguments in favor of affirming the Juvenile Court's dismissal.

We note that the cases cited by the parties on the standard of review relate to a trial court's dismissal of an entire case, not the dismissal of a petition to rehear filed pursuant to Juvenile Court procedures. *See, e.g., Kotil v. Hydra-Sports, Inc.*, No. 01-A-01-9305-CV00200, 1994 WL 535542, at *3-4 (Tenn. Ct. App. Oct. 5, 1994). However, we assume for purposes of argument that the standard of review in this case is abuse of discretion, in light of the necessity of recognizing the trial court's inherent authority to control the dockets and the proceedings in their courts. *Id.* at *3.

Our analysis is affected by the procedural status of the case at the time the Juvenile Court considered Mother's second motion to dismiss for lack of prosecution. Mother's motion to dismiss for lack of prosecution related only to Father's petition to rehear the Juvenile Court's earlier ruling on his child support obligation. By granting Mother's motion to dismiss the petition to rehear, the Juvenile Court left intact its earlier order setting the amount of Father's child support. Mother concedes that the earlier ruling on child support did not become a final, appealable order until the resolution of Father's petition to rehear. Once a final order was entered, Father could raise on appeal any issues arising from the interlocutory orders that preceded the dismissal of his petition to rehear. *See Nepp v. Hart*, No. M2005-2024-COA-R3-CV, 2006 WL 2582503, at *5 (Tenn. Ct. App. Sept. 7, 2006). Therefore, even assuming that the Juvenile Court did not abuse its discretion in granting Mother's motion to dismiss the petition to rehear for lack of prosecution, we nevertheless must address Father's argument that the Juvenile court erred in setting the amount of his child support obligation. Accordingly, we reject Mother's argument that affirmance of the Juvenile Court's dismissal of Father's petition to rehear pretermits consideration of the other issues raised by Father. We go on to address Father's arguments.

**Factual Finding on Obligor's Income**

Father argues first that the Juvenile Court's determination on his child support obligation must be reversed because the Juvenile Court did not make an express factual finding on Father's annual income, and therefore did not have an appropriate basis for setting the amount of his

child support. He argues that the requirement for such an explicit finding is implicit in the Child Support Guidelines in effect in April 2000, when the Juvenile Court set his child support, noting the Guidelines' detailed provisions on what is and is not considered income for child support purposes. He also cites this Court's decision in *Ford v. Ford*, No. 01A01-9611-CV-00536, 1998 WL 730201 (Tenn. Ct. App. Oct. 21, 1998), in which the Court stated: "Determining the obligor parent's income is an indispensable part of every child support proceeding." Id. at *4. In her appellate brief, Mother asserts that the Juvenile Court in fact "concluded. . . that Appellant's actual income in 1999 was $61,494.00 a month." At oral argument, Mother conceded that the Juvenile Court in fact made no express factual finding on Father's income, but contends that the finding is implicit in the amount of child support set, pointing out that the amount of the monthly child support is consistent with the income level opined by Mother's accountant in his expert testimony.

We agree with the statement of the Court in *Ford v. Ford* that determining the obligor parent's income is essential to setting that parent's child support obligation. However, we find no provision in either the statutes or the Child Support Guidelines in effect at that time that require the trial court to make an express factual finding on the obligor parent's income.[13]

In some cases, even if such a factual finding is not required by the statutes or regulations, a remand for an express factual finding by the trial court may be necessary for the appellate court to review the trial court's child support decision. In this case, however, as argued by Mother, we can glean from the record that the Juvenile Court credited the testimony of Mother's expert accountant, Mr. Curbo, who reviewed the documents provided to him and opined that Father's gross income was approximately $730,000 per year, based primarily on the deposits into his bank accounts. The Juvenile Court stated expressly that it considered evidence on Father's gambling winnings and disregarded any evidence on his gambling losses. Thus, in this case, we decline to adopt Father's argument that the child support award must be reversed or the case must be remanded for an explicit finding on Father's income, as the basis for the Juvenile Court's implicit finding on his income is sufficiently clear in the record to permit this Court to adequately review the determination of child support.

### Insufficient Evidence

On appeal, Father argues that the Juvenile Court's child support award must be reversed because the evidence on which the Referee relied, namely, Mr. Curbo's testimony, was speculative. In his testimony, Mr. Curbo relied primarily on "incomplete" records from Father's bank accounts, such as cancelled checks and account statements for only a few

---

[13]In some types of cases, the trial court is required to make specific factual findings. *See, e.g.,* T.C.A. § 36-1-113(k) (2005), requiring specific findings in parental termination cases.

months. Father criticizes Mr. Curbo's method of "projecting" Father's income based on deposits in his bank account. He also notes that the Child Support Guidelines require child support to be calculated based on an average of the obligor parent's income for a period of two years, and asserts that the Juvenile Court in this case erred by failing to do so. In response, Mother argues that Father's repeated failure to produce requested personal and corporate financial records made it necessary for the Juvenile Court to rely on incomplete records.

We agree with Mother's argument. The appellate record in this cause includes numerous pleadings and transcripts of several proceedings over a period of years dominated by the attorneys sparring over whether Father had fully responded to Mother's discovery requests. The Juvenile Court was not required to postpone indefinitely its calculation of child support until Father produced more complete records. Ultimately, the child must be supported, and the Juvenile Court was left with little choice but to do the best it could with the financial records that it had. Moreover, while Mr. Curbo's method of "projecting" Father's income from his bank account statements is far from ideal, under the circumstances, we cannot find that the Juvenile Court abused its discretion in choosing to credit Mr. Curbo's testimony. This finding was based on a credibility determination by the trial court, to which we accord great deference on appeal. *See Cornelius v. State of Tenn. Dept. of Children's Services*, 314 S.W.3d 906, 907 (Tenn. Ct. App. 2009). Therefore, we must respectfully reject Father's contention that the child support award should be reversed based on the Juvenile Court's failure to utilize more complete records and its failure to average Father's income over a two-year period.

**Gambling Losses**

Father argues that the Juvenile Court erred in declining to offset his gambling winnings by his gambling losses in its calculation of his income for child support purposes. In support, Father relies on this Court's decision in *Thurman v. Thurman*, 03A01-9507-CH-00222, 1995 WL 635749 (Tenn. Ct. App. Oct. 31, 1995), in which the custodial mother argued that the trial court erred in its treatment of the obligor father's gambling income in calculating his child support. In *Thurman*, the Court stated: "Appellee (mother) insists that the court erred in excluding from the income of the appellant (father) . . .gambling winnings. . . .We are of the opinion that this was not error. The gambling winnings were offset by corresponding losses. Therefore, there was no real income from gambling." *Id.* at *3.

In response, both Mother and the State agree that the Juvenile Court did not consider Father's gambling losses in its calculation of his income for child support purposes, but characterize the Juvenile Court's action as a sanction for Father's repeated failure to produce requested reliable financial records, and argue that imposing this sanction was not an abuse of

discretion. Neither point to any additional authority addressing whether gambling losses are to be considered in calculating an obligor parent's income.

From our review of the appellate record, we must respectfully disagree with both Mother and the State as to the reason for the Juvenile Court's decision not to consider Father's gambling losses in its calculation of his income. The record shows that the Juvenile Court excluded evidence of the gambling losses based on its understanding of the Child Support Guidelines, as demonstrated in this exchange:

> THE COURT: How [Father] spends his money in Tunica County, Mississippi, is like how people come in here and say, well, I pay rent and I pay this and I pay that. That's just how he spends his money. That's his choice.
> [FATHER'S COUNSEL]: But, Your Honor, in order to count gambling winnings, you always have gambling losses. You do not always win.
> THE COURT: In the context of income for child support, I'm not the IRS. How he wants to spend it is either good fortune or bad fortune. Child support guidelines don't say you deduct losses from winnings in gambling. It just says you calculate income.

These statements indicate that the Juvenile Court Referee did not exclude evidence of gambling losses as any sort of sanction for discovery misconduct. Rather, the Juvenile Court Referee found that, in contrast to the calculation of income for purposes of federal income tax, as a matter of law, gambling losses are not to be considered in calculating income for child support purposes. Consequently, we review the Juvenile Court's decision based on this premise.

"The fairness of a child support award depends on an accurate determination of both parents' gross income. . . ." **Massey v. Casals**, 315 S.W.3d 788, 795 (Tenn. Ct. App. 2009). We find no Tennessee authority on how to consider gambling losses for child support purposes, other than the **Thurman** decision cited by Father. Authorities outside Tennessee, such as federal income tax law or caselaw from our sister states, are not binding but nevertheless may be instructive. For purposes of federal income tax, income from gambling is included in the taxpayer's income for tax purposes; however, to determine if the taxpayer derived income from his gambling activities, gambling losses may be deducted only to offset the gambling gains, and only to the extent of that year's gambling gains. **See** I.R.C. § 165(d) (2000); 35 AM. JUR. 2D *Federal Taxation* §§ 13260, 16836; **Brinton v. Brinton**, No. M2009-02215-COA-R3-CV, 2010 WL 2025473, at *1 n. 1 (Tenn. Ct. App. May 19, 2010).

The Arkansas Supreme court addressed gambling winnings and losses in the context of child support in **McWhorter v. McWhorter**, 58 S.W.3d 840 (Ark. 2001). In **McWhorter**, the

-14-

obligor father contended that his gambling winnings were not income for child support purposes, but if gambling winnings were included, the father contended that they should be reduced by his gambling losses. *Id.* at 842. The *McWhorter* Court concluded that the definition of "income" in Arkansas's child support guidelines was intentionally broad. It also noted that gambling winnings are included as gross income for federal income tax purposes. *Id.* at 481-82. Based on these authorities, it held that gambling winnings are included as income for purposes of determining child support. *Id.* at 482.

The *McWhorter* Court then addressed the father's argument that his gambling losses should be credited against his winnings up to the amount of the winnings, as provided in federal income tax laws. *Id.* The *McWhorter* Court observed that, in setting an obligor parent's child support, the "ultimate objective" is to determine "the true disposable income of the child-support payor." *Id.* at 846. It then held:

> For purposes of the instant case, the true expendable or disposable income can only be arrived at by crediting gambling losses only to the extent of winnings. We reverse the chancery court on this point and remand for further proceedings to prove gambling losses for the calendar years in question.

*Id.*[14] This approach has been adopted by Louisiana as well. *See Bagwell v. Bagwell*, 812 So.2d 8564, 861 (La. Ct. App. 2002) ("[W]e . . . find that gambling winnings (as offset by proven gambling losses) are properly characterized as gross income for child support purposes.").

We are persuaded that the approach adopted by the Arkansas Supreme Court is a wise approach. Child support decisions are not intended to punish parents for behavior such as gambling; rather, as noted in *McWhorter*, the aim is to determine the true disposable income of the child-support payor. Therefore, we hold that, in determining Father's gross income for child support purposes, his gambling losses may be applied to offset his gambling winnings, up to the amount of the winnings for the year in question, and the Juvenile Court erred in declining to consider proof of his gambling losses.

We note that, on remand, if Father's provable gambling losses do not offset his gambling winnings for the pertinent time period, the Juvenile Court should also look to whether this is a dependable source of continued income on which to base a child support award. This Court

---

[14]The *McWhorter* Court added: "[W]e note that while [the father's] 1040 tax returns may be a starting point, documentary evidence must be presented to the chancery court to prove his gambling losses." *McWhorter*, 58 S.W.3d at 846.

has held that non-wage monies such as lottery winnings or inherited funds can be included as part of the obligor parent's income for child support purposes, but cautioned:

> [C]ourts setting child support ordinarily look not so much to the source of the income – whether inheritance, wages, or lottery winnings – as they look to the dependability of its continued receipt. . . .
>
> Courts should be wary of increasing child support based on possible income that is merely speculative. . . . Instead, they should focus on "income regularly received by the obligor."

*Ford v. Ford*, No. 01A01-9611-CV-00536, 1998 WL 730201, at *4 (Tenn. Ct. App. Oct. 21, 1998) (citations omitted).

### Net Income

Father also argues that the Juvenile Court erred in applying the percentages in the Child Support Guidelines to his gross income, rather than his net income. Neither Mother nor the State directly addresses this argument in their appellate briefs.

As noted above, the Juvenile Court did not explicitly set forth its calculations in setting child support. However, in the trial exhibits prepared by Mother's expert Mr. Curbo, apparently relied upon by the Juvenile Court, Mr. Curbo first finds the gross monthly income based on the monies that passed through his bank accounts, then deducts from that figure Father's "Income Tax Paid on Reported Income," with an explanatory footnote stating: "Taxes based on income [Father] actually reports to IRS." The 21% Guideline percentage is then applied to this "net" income.

Under the Guidelines in effect at that time, child support was calculated by application of the appropriate percentage to the obligor parent's "net income." See TENN. COMP. R. & REGS 1240-2-4-.03(4), (5)(1997). The Guidelines mandated that "net income" be calculated by making appropriate subtractions for withholdings and federal income tax from the obligor parent's *entire* gross income. This was not done by the Mother's expert accountant, and apparently was not done by the Juvenile Court. Consequently, we must conclude that the Juvenile Court erred in its calculation of Father's child support. On remand, the Guideline percentage must be applied to Father's net income as required by the Guidelines.

### Summary

In sum, we reverse the Juvenile Court's determination of Father's child support obligation insofar as the Juvenile Court refused to consider Father's provable gambling losses to offset

his gambling winnings, did not calculate Father's net income in the manner mandated under the Guidelines, and did not apply the Guidelines percentage to the net income. In all other respects, the holding of the Juvenile Court is affirmed. We remand the cause for further proceedings on Father's child support, consistent with this Opinion, with instructions for the Juvenile Court to base Father's child support on the income Father regularly receives.

## CONCLUSION

The decision of the Juvenile Court is affirmed in part, reversed in part, and remanded as set forth above. Costs on appeal shall be taxed to Respondent/Appellant, Keith W. Campbell and his surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE